SHUKAT ARROW HAFER WEBER & HERBSMAN, LLP
Dorothy M. Weber, Esq. (DMW 4734)
494 Eighth Avenue, Suite 600
New York, NY 10001
(212) 245-4580
dorothy@musiclaw.com
Attorneys for Plaintiff

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
---------------------------------------------------------------------X

YOKO ONO LENNON,

                Plaintiff,              Case No. 1:20-cv-08176

  -against-

                                               **COMPLAINT**

FREDERIC SEAMAN,

                Defendant.

---------------------------------------------------------------------X

      Plaintiff Yoko Ono Lennon, by her attorneys Shukat Arrow Hafer Weber & Herbsman, LLP, alleges for her complaint, upon knowledge and belief as to her own acts and upon information and belief as to the acts of all others, as follows:

THE PARTIES, JURISDICTION AND VENUE

      1.    Plaintiff Yoko Ono Lennon ("Plaintiff" or "Mrs. Lennon") is a Japanese citizen and resident of the State of New York.  She is an internationally known philanthropist, musician and artist.  Mrs. Lennon is also the widow of the late John Lennon - one of the most successful and influential musicians of all time.

      2.    Together, she and Lennon recorded numerous albums, including *Unfinished Music No. 1: Two Virgins*, *Unfinished Music No. 2: Life With the Lions*,

*The Wedding Album*, *Sometime in New York City*, *Double Fantasy*, which won a Grammy Award in 1981 as Album of the Year, and *Milk and Honey*, which was released after Lennon's death.

3. Since the "Bed-Ins for Peace" held in Montreal and Amsterdam in 1969, Mrs. Lennon has dedicated her life to campaigning for world peace and human rights. On September 21, 2020, The Peace Studio inaugurated the "Yoko Ono Imagine Peace Award".

4. Mrs. Lennon has succeeded to all copyrights interests owned by Lennon prior to his death.

5. Defendant Frederic Seaman is a citizen and resident of the State of New York.

6. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1338 and principles of pendent jurisdiction. The claims herein arise under Sections 106, 201, and 501 of the Copyright Act (17 U.S. C. §§ 106, 201, 501) and the common law.

7. Plaintiff is the duly registered owner of the following copyright registrations: Imagine: John and Yoko Aboard the Imagine (VA 950-558); Imagine: The Lennons on Bikes (VA 950-559); Imagine - Sean and Julian (VA 950-557); John and Sean in Bermuda (VA 946-752); The Lennon Family III Chronology (VAu 428-951); The Lennon Family III Chronology Supplement (VAu 523-944); The Lennon Family Series I (VAu 440-333); The Lennon Family Series II (VAu 440-340).

8. Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391(b).

## NATURE OF THE ACTION

9. Plaintiff brings this action for copyright infringement, fraud and contempt of Court for violation of the So Ordered Final Judgment on Consent signed by the Hon. Leonard B. Sand on June 27, 2003 and duly entered on June 30, 2003 (the "So Ordered Final Judgment on Consent").

10. The So Ordered Final Judgment on Consent was the culmination of the action commenced in the United States District Court, Southern District of New York, *Yoko Ono Lennon vs. Frederic Seaman* (99 Civ. 2664)(the "1999 Action"). (See Complaint (Dkt. 1), First Amended Complaint (Dkt. 16), Second Amended Complaint (Dkt. 22), and Third Amended Complaint (Dkt. 90)).

11. After an extensive litigation and jury trial from September 23, 2002 through September 26, 2002, and both sides appearing by counsel, and after the conclusion of all evidence, Seaman and the Plaintiff entered into the So Ordered Final Judgment on Consent. A copy of the So Ordered Final Judgment on Consent is attached hereto as **Exhibit A**.

12. The So Ordered Final Judgment on Consent embodies the full, complete, and entire agreement and understanding of the parties of all of the terms and conditions with respect to the matters discussed hereinbelow.

<u>THE SO ORDERED INJUNCTION</u>

13. The Injunctive relief paragraph of the So Ordered Final Judgment on Consent provides, *inter alia*, that:

>  1. Defendant Frederic Seaman, and anyone acting in concert or participation with him plus Defendant's representatives, assigns, administrators and heirs are permanently and perpetually enjoined from divulging, exploiting, or publicizing, commercially or otherwise, in any manner or medium now and hereafter devised whatsoever, any information, facts, anecdotes, or other statements relating in any way to John Lennon, Yoko Ono Lennon or Sean Lennon (collectively "The Lennon Family"). For the avoidance of doubt, this injunction includes, without limitation, statements made in books, fiction or non-fiction, magazine articles, press interviews, television reports, documentaries, radio interviews, audio recordings, file or video recordings, or any other medium of public dissemination. For the further avoidance of doubt, this injunction also applies to the publication of any image of the Lennon Family (or any one of them) including, without limitation,
>
>> a) The 374 photographs at issue in this Action, copies of which were marked during the trial herein as Plaintiffs Exhibits 2, 3, and 4 (the "374 Photographs"); and
>>
>> b) Copies, in any medium, of the "Cannon Hill Video," a copy of which was marked during the trial herein as Plaintiff's Exhibit 6 (the "Cannon Hill Video"), or any portion whatsoever thereof;
>
> **For the further avoidance of doubt, this injunction also applies to any reprinting or reissuance of the book, <u>The Last Days of John Lennon</u>, or any version thereof, under any title, authored by defendant Frederic Seaman, and to any reprinting or republication of any other work by Frederic Seaman relating to the Lennons which has been published or publicly displayed prior to the date hereof, including without limitation, any of the magazine articles or videos which were at issue in the Action. (emphasis added)**
>
> 2. By this Judgment, it is hereby declared that the 374 Photographs and any other photograph taken by Frederic Seaman of any member of the Lennon Family, or taken on or at premises owned or controlled by John Lennon and Yoko Ono Lennon (collectively the "Lennons"), are works-made-for-hire for the Lennons and, accordingly,

4

Mrs. Lennon, as successor to all joint interests of the Lennons, is the rightful owner of the copyrights therein, it is further declared that Frederic Seaman has not and has never had rights to the copyrights to 374 Photographs or any such photographs which he took of the Lennon Family (or any one of them) or at the premises owned or controlled by the Lennons.

Exhibit A, ¶¶ 1-2.

## SEAMAN'S LONG-TERM ENTERPRISE OF FRAUD AND CRIMINAL CONDUCT

14. In February 1979, Seaman was hired as an employee of the Lennon household helping to care for their young son Sean Lennon, running errands for the Lennon family, and accompanying Lennon, Mrs. Lennon and their son Sean Lennon (collectively the "Lennon Family") in many of their travels.

15. From the outset of their relationship, and for obvious reasons, privacy was of the utmost importance to the Lennon Family, and that under no circumstances was Seaman to publicly discuss facts about the Lennons' private lives. At the time that he was hired, Seaman signed a memorandum of understanding regarding his employment that stated:

> You have specifically agreed, as a condition of your employment, at no time, without our prior express written consent to same, whether you are then employed by us or not, not to divulge, exploit, commercially or otherwise, or publicize, in any manner whatsoever, any information, facts, anecdotes, or otherwise relating to us in any manner, including but not limited to, books, fiction or non-fiction, magazine articles, press interviews, television reports, documentaries, radio interviews, recordings, or any other manner relating to the public dissemination of information through the media or otherwise.

16. On December 8, 1980, John Lennon was murdered by Mark David Chapman in front of the Lennon home at The Dakota in Manhattan. Tens of millions of fans worldwide mourned Lennon's untimely death.

17. That Seaman is a miscreant and self-promoter is incontrovertible: his first instinct after the horrific murder of John Lennon was to rob the Lennon Family for the purpose of gaining fame and fortune from exploiting a "self-created" celebrity status (the "Scheme").

18. Immediately after Lennon's murder, Seaman launched the Scheme by which he would exploit Lennon's death by stealing priceless personal and sentimental items, including Lennon's personal diaries. He stole these items from Mrs. Lennon's apartment during her and Sean's time of mourning.

19. Pursuant to Seaman's larcenous plan, he would not only profit financially from Lennon's death, but he would also defame Mrs. Lennon and falsely attempt to portray himself as Lennon's only true confidante by falsely enhancing his status as a "gofer."

20. The Scheme was so elaborate that Seaman gave it a code name "Project Walrus," (presumably in reference to the Beatles' song "I am the Walrus"). "Project Walrus" had two major objectives: first, to steal Lennon's most personal possessions from his home at The Dakota so as to establish Seaman as a member of Lennon's "inner circle" in the years before his death, and second, to destroy Mrs. Lennon's reputation and to disparage her relationship with Lennon through a campaign of lies, innuendo, and gross slander.

21. *Just two days after Lennon's murder*, Seaman showed up at the door of an old college friend to say, excitedly, "I'm set for life." ("The Betrayal of John Lennon," at p. 4, printed in Playboy Magazine, March 1984 (the "Playboy Article"), a copy of which is attached as **Exhibit B** hereto.))

22. Within two weeks after Lennon's death, Seaman had drawn up and notarized a contract with Bob Rosen ("Rosen"), whereby the two agreed to be equal partners on a book about Lennon, as well as numerous related projects designed to capitalize on Lennon's death.

23. Pursuant to the Scheme, Seaman returned to work full time at The Dakota, reported daily to Rosen about the goings-on there, and regularly took money from Mrs. Lennon's petty cash fund to pay Rosen a salary.

24. Within a week after his return to work, Seaman began a routine of theft that would continue for the next year. Every Friday afternoon, Seaman would take a shopping bag full of confidential documents and personal items from Mr. and Mrs. Lennon's office files and from the Lennon apartments. During the year, he spirited away Lennon's unreleased recordings, paintings, love letters, and Lennon's journals covering the period from 1975 up until the day that he was killed, which contained Lennon's most personal thoughts and admissions during the period that he was trying to escape the public view. Seaman delivered these items to Rosen, who would scrutinize, copy, and digest the information.

25. By December 1981, a year after Lennon's murder, Seaman began to abuse his position of trust more openly and boldly. He used limousines to take him

7

to restaurants and clubs, and charged these expenses to Mrs. Lennon. He wore Lennon's clothing, and tried to claim that it was his own. He used Mrs. Lennon's Mercedes-Benz for personal business, and got into an accident causing $12,000 in damage. Finally, Mrs. Lennon caught Seaman taking a bath in her private bathroom during his working hours. Mrs. Lennon fired Seaman in late 1981.

26. All told, during the last year of his employment by Mrs. Lennon, Seaman absconded with entire filing cabinets worth of papers containing Lennon's diaries from 1975 to 1980, as well as Lennon's unreleased recordings, love letters between Mr. and Mrs. Lennon, fan mail, personal photographs, clothing, stereo equipment, tapes, paintings, and even a novella by Lennon titled "Skywriting by Word of Mouth." At the time of Seaman's termination, the thefts remained undiscovered.

27. In early 1982, Seaman paired up with a new conspirator, who agreed to finance the Scheme. The Scheme, as Seaman described in his journal, was "to set Seaman up as the real inheritor of Lennon's artistic and social legacy and to spread as much misinformation about [Mrs. Lennon] as possible."

28. In April 1983, Plaintiff found out that Seaman was about to publish a book based largely on Lennon's private stolen diaries. Seaman was subsequently arrested on charges of grand larceny. The police seized numerous stolen articles from Seaman's possessions.

29. Seaman's criminal enterprise and betrayal ultimately led to Seaman's indictment in 1983. On May 27, 1983, Seaman pleaded guilty to second-degree larceny for theft of Lennon's journals. He was sentenced to five years' probation. His

plea was contingent upon several agreements, including his promise "to return any and all property, in his possession or which he has access to, wrongfully taken, obtained or withheld from Lenono, John Lennon, Yoko Lennon, Sean Lennon, or the [E]state of John Lennon." (Plea Bargain Agreement, ¶ 4(d), a copy of which is attached as **Exhibit C** hereto.)

30. Pursuant to the Plea Bargain Agreement, Seaman also agreed not to reveal the contents of the Lennon diaries. (Plea Bargain Agreement, ¶ 4(a)).

31. As a part of the Plea Bargain Agreement, Seaman turned over several boxes of personal items to Mrs. Lennon, including family photographs, Lennon's journals from 1974 to 1980, and many of Lennon's private letters, which were purportedly all of his ill-gotten gains.

32. At the time, Mrs. Lennon believed that to be the end of her ordeal with Seaman.

33. Those representations turned out to be lies and the start of yet another scheme.

## THE 1999 LITIGATION

34. Notwithstanding a guilty plea and purported return of the Lennons' property, Seaman was not finished exploiting the Lennons.

35. In 1999, Plaintiff found out that Seaman had deceived Plaintiff (and the District Attorney's office in 1983) when he represented that he had returned to her everything that he had stolen, including hundreds of family photographs. This

revelation resulted in the 1999 Action, the lawsuit described in paragraph "10" hereinabove.

36. After almost three years of extensive litigation, including a jury trial, Seaman agreed to a Final Judgment on Consent which was so ordered by the Hon. Leonard B. Sand on June 30, 2003 (i.e., the So Ordered Final Judgment on Consent).

37. Seaman acknowledged <u>again</u>, that, during the years of his employ with the Lennons, he stole property belonging to the Lennons and the Lennon household and other premises owned or controlled by the Lennons, that he failed to return such property, and that he had sold such property on the memorabilia market.

38. Seaman agreed to the following public statement in open court:

> I wish to offer this public apology to Yoko Ono; I did wrong by you and indeed am guilty of violating your trust. After more than 20 years, it is time for me to ask your forgiveness for my actions. I did in fact steal items from you that once belonged to you and John. These items include diaries, documents, and more. I wrote things about you and your family in my book and various tabloids that were factually inaccurate and I now realize how much pain and embarrassment I have caused. It is impossible to undo what has taken place. **But it stops here and now**. I will return any remaining things that I have that are yours. I will refrain from ever writing anything about you or your family or about my time in your employ. I offer no excuse for my conduct and only ask that you can find it in your heart to forgive so I can move on with my life.

(Exhibit A, ¶ 5).

39. After the So Ordered Final Judgment on Consent, Mrs. Lennon once again believed that Seaman's harassment and deception had finally come to an end. Unfortunately, a person who says they will never lie to you again is probably lying yet again – and Seaman proved that to be the case.

## SEAMAN'S BLATANT WILLFUL CONTEMPT OF COURT

40. Seaman's contrition at the end of the trial was just another scheme and certainly did not stop his behavior.

41. Despite his clear and unambiguous obligations and his oath that "it stop here and now", on September 10, 2020, Seaman sat for an interview from his apartment, flanked by Lennon memorabilia and willfully, wantonly and contumaciously violated the clear and ambiguous terms of the Injunction (the "September 2020 Interview"). (A screenshot with link to video of the September 2020 Interview is attached hereto as **Exhibit D**).

42. In the twenty-three minute, thirty-four second interview which consisted of a wholesale violation of the Injunction included in the So Ordered Final Judgment on Consent, Seaman discussed the following topics which are expressly and unambiguously prohibited:

- He discussed his employment with Mr. Lennon and Ms. Ono;

- Endorsed "Gimme Some Truth";

- Attributed multiple statements to the late Mr. Lennon regarding the Eastmans;

- Made statements regarding Ringo Starr's visit to Mr. Lennon at the Dakota apartment building around Thanksgiving 1980;

- Discussed Mr. Lennon's murder.

11

43. Incredibly, Seaman then went on to state his intent to willfully and intentionally violate the Injunction even further in connection with his book <u>The Last Days of John Lennon</u>:

> **"...at some point in the future I would like to revise it and publish a revised and expanded edition".**

44. Indeed the whole interview willfully ignored his guilty plea, the trial of the 1999 Action, and the So Ordered Final Judgment on Consent.

45. These statements were made in knowing violation of the clear and unambiguous language of two express restrictions in the Injunction. Seaman also infringed Plaintiff's copyright by prominently publishing and displaying one of Plaintiff's copyrighted photographs of the Lennon Family in Bermuda. (Exhibit A, ¶ 1).[1]

46. Further, in 2013, Seaman was directly or indirectly involved in the book entitled *Lennon at Sea*. The public relations surrounding and the dedication in the book clearly and unequivocally stated that Seaman not only permitted the author to use his story, but also provided "rare & unpublished material[.]" Plaintiff, upon learning of Seaman's involvement in this book, gave written notice to Seaman alerting him to his violations of the So Ordered Final Judgment on Consent and the Injunction. (Copies of letters sent by counsel to Seaman regarding the 2013 violation are attached hereto as **Exhibit F**.)

---

[1] Counsel gave written notice dated September 15, 2020 to Seaman of his violation of the So Ordered Final Judgment on Consent, a copy of which is attached hereto as **Exhibit E**. As of the date of this Complaint, Seaman had not responded.

47. As a direct consequence of Seaman's actions, Mrs. Lennon has suffered and will suffer irreparable harm. By this action, Mrs. Lennon seeks to again try to disabuse Seaman that he is entitled to exploit the name and intellectual property of Mrs. Lennon. Unless otherwise ordered by this Court <u>again</u> and held in contempt and punished for his contumacious behavior, it is clear that Seaman's abuses will continue.

FIRST CLAIM FOR RELIEF
(Copyright Infringement)

48. Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 47 with the same force and effect as if fully set forth herein.

49. At all relevant times, Plaintiff is and has been the rightful owner of the copyrights to the 374 family photographs (the "Family Photographs").

50. Plaintiff has a United States Copyright for the Family Photographs pursuant to 17. U.S.C. § 408, 409: Imagine: John and Yoko Aboard the Imagine (VA 950-558); Imagine: The Lennons on Bikes (VA 950-559); Imagine - Sean and Julian (VA 950-557); John and Sean in Bermuda (VA 946-752); The Lennon Family III Chronology (VAu 428-951); The Lennon Family III Chronology Supplement (VAu 523-944); The Lennon Family Series I (VAu 440-333); The Lennon Family Series II (VAu 440-340).

51. Defendant has no license or other form of permission to copy, duplicate, or to sell or distribute copies of those photographs or derivative works based in whole or in part upon those photographs.

52. Defendant has infringed Plaintiff's copyrights in the Family Photographs, in violation of Sections 501 and 106 of the Copyrights Act, 17 U.S.C. §§ 501, 106, by publishing the Family Photographs.

53. Defendant's unauthorized exploitation of the Family Photographs is in derogation of and injurious to Plaintiff's exclusive rights as the owner of the copyright to the Family Photographs, all to Plaintiff's substantial damage.

54. By reason of the foregoing acts of copyright infringement, Plaintiff is entitled both to a permanent injunction enjoining Defendant from continuing the aforesaid acts of infringement, and to an award of damages in an amount to be proved at trial.

## SECOND CLAIM FOR RELIEF
(Injunction)

55. Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 54 with the same force and effect as if fully set forth herein.

56. At all times herein Plaintiff was and is the rightful owner of the copyrights to the Family Photographs.

57. By his public dissemination of the Family Photographs with depictions of and including the Lennon Family, Defendant has violated Plaintiff's copyright interests in those works.

58. Plaintiff has been damaged by Defendant's public dissemination and claim of copyright to the Family Photographs and by Defendant's threat to republish the enjoined work, The Last Days of John Lennon (the "Enjoined Book"). Plaintiff

will continue to be damaged in the future if Defendant continues to publicly disseminate the photographs or to republish and expand the Enjoined Book.

59. This Court is authorized by 17 U.S.C. § 502 to enjoin this threatened future infringement of Plaintiff's copyright.

## THIRD CLAIM FOR RELIEF
(Breach of Contract)

60. Plaintiff incorporates the allegations of paragraphs 1 through 59 with the same force and effect as if set forth in full herein.

61. Seaman has breached his contractual duties under the So Ordered Final Judgement on Consent by violating the terms of the settlement by, <u>inter alia</u>, giving a prohibited interview and by stating that he intended to republish the Enjoined Book.

62. Plaintiff has performed each and every act required to be performed by them in accordance with the terms and conditions of the relevant agreements including the So Ordered Final Judgment on Consent.

63. As the direct and proximate result of Seaman's breach of contract, Plaintiff has sustained and will sustain actual damages in an amount to be determined at trial but not less than $150,000, which Plaintiff is entitled to recover from Seaman with appropriate interest thereon.

## FOURTH CLAIM FOR RELIEF
(Fraud)

64. Plaintiff incorporates the allegations of paragraphs 1 through 63 with the same force and effect as if set forth in full herein.

65. Seaman's wanton disregard of his obligations under the agreements including the So Ordered Final Judgment on Consent is a result of his intention to not perform the obligations imposed by the So Ordered Final Judgment on Consent. Unbeknownst to Plaintiff, Seaman has clearly developed and created additional schemes in order to perpetuate a pattern of practices that have deprived Plaintiff of the hard fought results in the 1999 Action.

66. It is clear Seaman engaged in fraudulent practices and embarked on a self-serving course of conduct designed to again enrich himself at Plaintiff's expense which practices he has concealed from Plaintiff.

67. The September 2020 Interview is indicative of Seaman's fraudulent intent to continue to take advantage of Plaintiff by perpetuating his deceitful conduct. Seaman never possessed a good faith intention of fully performing under the agreements. Rather, Seaman possessed a preconceived intent to continue a systematic scheme of fraud and deceit.

68. On information and belief, Seaman has engaged in other fraudulent conduct, which conduct cannot be ascertained without an accounting by Seaman.

69. Seaman was at all times aware that his misrepresentations were fraudulent, false and deliberately misleading and that his misrepresentations were material. Seaman made these misrepresentations and omissions knowingly and with the intention of inducing Plaintiff to rely upon them.

70. As the direct and proximate result of Seaman's fraudulent conduct and collateral side deals, Plaintiff has sustained and will sustain damages including the

loss of income and the dilution of Plaintiff's legitimate market together with other and further damages to be proved at trial.

71. Seaman has acted willfully, maliciously and with gross, wanton and deliberate dishonesty and with complete disregard for the interests of Plaintiff.

72. An award of exemplary and punitive damages is necessary to punish and deter such conduct so that it does not occur again.

73. As the direct and proximate result of Seaman's fraudulent conduct, Plaintiff is entitled to recover compensatory damages from Seaman in an amount to be determined at trial, but not less than $150,000, together with other damages caused by Seaman's conduct, together with appropriate interest thereon, and exemplary and punitive damages.

**WHEREFORE,** Plaintiff demands judgment against Defendant as follows:

a. On Count I:

    1) Enjoining Defendant and his agents and representatives from producing, manufacturing, printing, distributing, selling, marketing, promoting, advertising and/or otherwise exploiting the copyrighted Photographs.

b. On Count II, that:

    1) Defendant be restrained and perpetually enjoined from infringing Plaintiff's copyright interest in the Photographs, and any and all other photographs, videotapes or depictions of or including the Lennon Family.

2) Defendant be ordered to turn over to Plaintiff <u>all</u> copies of any Lennon Photographs or materials in his possession including but not limited to the copy provided to him pursuant to the Consent Judgment (including the Box Set of Photograph).

c. On Count III, awarding Plaintiff her actual damages, in an amount to be determined at trial, and awarding Plaintiff punitive damages in an amount to be determined at trial;

d. On Count IV, awarding Plaintiff her actual damages, in an amount to be determined at trial, and awarding Plaintiff punitive damages in an amount to be determined at trial;

e. On all claims for relief, awarding Plaintiff reasonable interests and costs and expenses of this action, including attorney fees; and

f. Awarding Plaintiff such other and further relief as may be just and proper including an order of contempt for Defendant's willful and contumacious conduct including but not limited to punitive damages for repeated violations of the Court's Order.

Dated:  October 1, 2020
        New York, New York

                                    SHUKAT ARROW HAFER WEBER &
                                    HERBSMAN, LLP

                            By:     /s/ Dorothy M. Weber
                                    Dorothy M. Weber (DMW-4734)
                                    494 Eighth Avenue, Suite 600
                                    New York, NY 10001
                                    (212) 245-4580
                                    dorothy@musiclaw.com
                                    *Attorneys for Plaintiff*
                                    *Yoko Ono Lennon*